Good morning, Your Honors, and may it please the Court. Brad Garcia for Ace American Insurance Company. Our briefs detail four legal errors in the District Court's summary judgment ruling. I'd like to begin today by focusing on the corrosion exclusion, which disposes of the entire case and requires entry of judgment for Ace before addressing reformation and the other issues. The corrosion exclusion bars coverage here because the damage at issue is acid-caused corrosion of the building. The District Court held that the exclusion does not apply because the acid that caused the corrosion is not also specifically excluded. But as courts around the country have explained, that approach nullifies the corrosion exclusion because corrosion is always caused by some event or some material. Instead, the rule in every case involving a corrosion exclusion that either party has identified is that if the damage is corrosion, the exclusion applies. The catalyst does not also need to be excluded. Wasn't there some damage here, though, that wasn't corrosion-derived? For example, some of the walls had some damage, and that wasn't necessarily corrosion. No, Your Honor. Every — all of the damage is damage to the building caused by acid. And whatever that is, whether it's the wood, the floor — Well, that's their argument. That's their argument. But your argument is, whether it was acid or something else, if it's corrosion, it's not covered. But there was some damage that corrosion wouldn't be a fair characterization of what caused that damage, for example, the walls. And it's the last thing that you said that I'm disagreeing with, Your Honor. The dictionary definition of corrode is to eat away or diminish by acid. So when the acid is interacting with a material, that chemical reaction is corrosion. And that is supported by the by many of the cases that we cite. There's simply no other way to characterize what acid does to a material than corrosion. And I think that has actually never been disputed. We relied in the district court on the undisputed factual record and cited all of these same  Now, on appeal, Waddles is attempting to dispute that factual premise, but the only argument they made below is the legal argument that I've already mentioned, which is that because the acid is not also excluded, the corrosion exclusion should not apply. And so when you put aside that factual premise — and I'm certainly happy to address more questions about that — but in every single case, the one I'll use as an example is the Bedigal case that we cite from Massachusetts. In that case, cars tracked de-icing salts over the That salt degraded, attacked the parking structure. And the insurer tried to avoid a corrosion exclusion by saying this was caused by the salt. It's caused by the chloride ions that penetrate and contaminated the structure. And the Court said, no, that approach will completely nullify the corrosion exclusion. And our situation here is the same. How do you handle it? Your opposing counsel talks about the Georgia's efficient proximate cause doctrine. I never understand in phrases like that. There must be an inefficient proximate cause somewhere. But the efficient proximate cause doctrine would suggest you have vulnerability, where you have something that causes a problem. I mean, let's assume the pollution, we're not reforming the policy, and that the cause here was the acid. And other little things happen along the way, but that was the cause. And under that doctrine, you would be liable, would you not? Well, no, Your Honor. I think, yes, if that articulation of the efficient cause doctrine applied in our case, we would have a problem. But the whole point of the legal argument we are making in every case is that that version of the efficient cause doctrine, which I would just easier to call it the dominant cause doctrine, it cannot apply to a corrosion exclusion. Because just as you described, Your Honor, the catalyst of the corrosion will always look like the dominant cause. It's the thing that sets other events in motion. And if you allow that analysis to take place here, you will never, ever apply the corrosion exclusion. And their brief actually confirms that. They say in their brief that the corrosion exclusion will apply if the catalyst is also excluded. But that just means that the corrosion exclusion itself never does any work. So you're essentially saying you're not trying at this point to reform the policy. So you're essentially saying you have a valid, a policy that has a valid inclusion for pollution, this kind of thing. But they lose the benefit of that coverage altogether if also in the exclusion, is what you're saying. The pollution inclusion is meaningless. That's correct, Your Honor. Well, it would separately exclude the policy. And there's nothing — it would separately exclude this loss. And there's nothing unusual, Your Honor, about two different exclusions applying to the same loss. So, yes, this is a — this is corrosion caused by a contaminant. So it would be excluded because the contaminant is excluded by a pollution exclusion. And we certainly stand by that argument, and I will address that. But it is separately excluded when the damage at issue is corrosion. And the district court shared the concern about the efficient proximate cause doctrine. And I just want to be very clear that there are still at least two situations where that doctrine applies when you have a corrosion exclusion. The first is if you have corrosion, like in this case, on the way to some later damage. So if you have corrosion and then there's a windstorm and the building collapses, you would do an efficient cause, dominant cause analysis to decide what should be treated as the cause. And the second situation, Your Honor, is if there are two perils, which is not this case, but imagine there was this corrosion and there's also termites over the years. And for whatever reason, you can't tell the difference between those two. Then you would again do a dominant cause analysis. The one situation where you never do that analysis in a corrosion exclusion is when you have one chain of events leading to corrosion because if you do that, the corrosion exclusion will never apply. Do you want to discuss the attorney's fees and the Napoleonic Code that Georgia has or are you going to just rest on the brief on that? I am happy to address any questions. We certainly stand by that argument. I would like you to address that. The liability extension. Yes, so this is the provision that says liability is covered for liability incurred in those countries in which a Napoleonic or other civil or commercial code applies due to loss or damage by a peril as defined by such code. A little bit of a mouthful, but there are two fundamental problems here. The first is this does not apply in the United States. And if you look at the deposition testimony of Grant Saunders And we had other cases that say this kind of clause doesn't apply in the United States. No, Your Honor. And candidly, we've not found any decision addressing this. That's why I began with the corrosion exclusion. And this clause is in a lot of policies, I would guess. I think it is actually fairly unusual. It's certainly in many of the policies in this case because they share the same form. But there's no decision construing it either way. And again, that's why I started with corrosion, because we do think that presents a legal issue that's resolved by all of the clear precedent that we cite. Again, they don't cite a single case even involving a corrosion exclusion. But on the liability extension, Your Honor, the reason so first There's no cases one way or the other anywhere. That's what you're telling us. Correct. That I have. I've searched every way I could think of, Your Honor. And but This provision in Louisiana, where they model some of their laws after Napoleonic code, plain, the insured would be good there. But otherwise, is that the only state in the Union where that would have the kind of code you're insisting on? Perhaps, Your Honor. So two answers. First, I do think that this is fairly read to envision a country-by-country analysis. And so it's looking at countries in which a Napoleonic or other civil or commercial code applies, meaning that that is essentially a reference to civil law countries. So even Louisiana, even Louisiana would be out under that one. That would be a much harder case for us, Your Honor. The real, the second reason here is that even in Louisiana, you cannot read this language to mean, it would be if the liability was incurred due to that code, due to a code. Tell me where you can get coverage. What country is it we can get coverage on that actually would meet this requirement? France, Italy, Germany, any civil law country in the world. And Exide is a worldwide operation. And this was a worldwide policy. So, and the reasoning there, Your Honor, is civil law countries have far more limited freedom of contract. And they do have codes that impose duties into contractual relationships, unlike in common law countries. Well, didn't we have a building code here that was violated by the damage that occurred? Well, there's no finding that it was violated. And that's because of my second point, the second problem with their argument, Your Honor, is that the liability here was incurred exclusively under the lease. The lease does not incorporate the building code or OSHA or indefinitely not this Georgia insurance provision. The liability indirectly, though, is the landlord can't rent this place out, anybody with acid dripping everywhere. And that derives from building codes that talk about stability of underlying structures and things. That may be true in an atmospheric, you know, explanatory way, Your Honor, but the liability incurred is due to the lease and lease provisions saying that it must be returned in good repair and they must repair structural damage and so on. The lawsuit didn't cite as a basis the building code, is what you're saying. Correct. If you look at their underlying trial brief, there is no mention of OSHA. I believe the building code gets a footnote, but it is 100 percent clear that that's not the basis of liability. The basis is the lease. And that just brings me back to the first point, Your Honor, that could be different in a civil law country where there's a code that says tenants shall not cause structural damage to a building. So if you went on that, that's $836,000, right? Yes. And that, well, at least $836,000 either way that disposes of the case. So the two issues that cleanly resolve this case in our favor are the corrosion exclusion, which bars $836,000, and the liability extension, which bars at least that $836,000. Why doesn't it also bar the post-judgment interest? It does. So it bars the $836,000 and the post-judgment interest. And in fact, Your Honor, our position is that it bars everything because this is a liability judgment they're seeking coverage for, but there is a dispute about whether the $1.4 million could be recovered on the short answer, Your Honor, is at most without the liability extension, they can recover $1.4 million. It is the way I analyze it, which I'd like your opponent to address. It seems to me we need not address either the pollution exclusion or the corrosion exclusion, but that both the $836,000 item and the $360,000 post-judgment interest item are barred by your interpretation of the Tenant's Liability Clause. That being the case, even if Exide should get its $500,000 attorney's fees and even if the Exide attorney's fees reduces the deductible, the $2 million deductible, the $2 million deductible is not exhausted because you've got $1.437 million that's clearly covered. And even if the $500,000 were covered and reduced the deductible, it's still not enough. That's exactly correct, Your Honor. And so either the Napoleonic Code issue or the corrosion exclusion would outright require the entry of judgment for Ace. I 100 percent agree. If there's no other questions, I'll reserve the remainder of my time. Speak to the defense costs specifically. Yes, Your Honor. So the district court erred by essentially awarding Waddles $500,000 in And this basically just comes down to the stipulation. They acquired a specific limited right to pursue recovery of the judgment. It does not include the right to pursue Exide's defense costs. And they actually don't dispute that. They have a separate argument about the policy language. But the simple reason they can't recover the $500,000 is because they can't recover the $500,000. There's no doubt about that. But I think what the district court was thinking, it wasn't very clear, but I think he was thinking that Exide itself could collect the $500,000, that that would reduce the deductible to $1.5 million. And therefore, you already got $1.437 million that is clearly covered. All your opponent would have to do is persuade us on either the $836,000 or the $360,000, and then they would be over the deductible. Yes. Well, I think that the $836,000 and the $300,000 or so are undisputedly resolved by the Napoleonic issue. And I agree that that is probably what the district court was thinking, but it actually shows why the conclusion it reached is wrong, because Exide itself actually still has authority to request those $500,000. It never has. And the error was essentially crediting that. Well, the footnote in the district court opinion, Exide responded to a request for admission, sounded like Exide had presented the claim, and it just had not been paid yet. So it provided notice of the loss in general. I believe it is undisputed they have never made a formal demand for payment. But in any event, Your Honor, that money would go to Exide, not to Waddles. True, true. But it could possibly reduce the deductible to $1.5 million. If it had been paid out to Exide, or there was a legitimate claim and it had been delayed. Thank you. Mr. Heffernan. Good morning. May it please the Court. Dan Heffernan for the appellee Waddles. I would like to first address the key facts that inform coverage, both for Judge Karn's question on the efficient proximate cause, and for Judge Anderson's question regarding the 8J2, so-called Napoleonic Code exclusion. It also addresses the issue of the lease raised by counsel. These key facts are as follows. Exide, the tenant, brought in truck battery casings into the warehouse, filled them with sulfuric acid. Counsel, I think we got that. I mean, what does that go to? We have specific issues about the amounts, and whether you got a deductible left or not. It goes directly to the corrosion exclusion and the efficient proximate cause around it. Unless it wasn't clear in the opening, we're less concerned about the corrosion exclusion, at least at this time, than we are about the other amounts, and it seems like you lose when we get through tallying, subtracting, and excluding because of stipulation problems. Now, you can argue what you want to. I'm just telling you that you can win on that corrosion and lose the game on the other matters. On the math, Your Honor? Yeah. All right. Let me explain the math. I mean, if the two items are excluded by the Napoleonic Code problem, for example, you I understand. and just go down the line. The $500,000 is excluded. I understand, but I can address that, Your Honor, and the district court did. On the defense cost sublimit, it's a $500,000 sublimit. It's expressly included within the deductible under the policy language. What policy language? Under the deductible policy language, the defense cost sublimit is included. I've read that. I think it's unclear, but wholly aside from that, I think the crucial problem for you, you can win on the $500,000 but lose on the $836,000 and the $360,000 and you've still lost. I'll address that, Your Honor, and one last point on the defense cost sublimit. It only needs to be incurred, and the evidence in the record is that Exide incurred it. It's included within the defense cost sublimit and the deductible, therefore the deductible is now $1.5 million. That's math. On the Napoleonic Code, Your Honor. One thing before you get off of the $500,000, because the Chief was interested in that, I think. It has not been paid. Is that not correct? It has been incurred but not paid. It's not required to be paid. Whether it's paid or not is irrelevant. What does the stipulation say specifically about incurred versus paid? It says that Exide incurred over $500,000 in defense costs in the underlying matter. And therefore, what does it say inside the stipulation? About incurring that $500,000. The key is the language of the policy that states expressly that defense cost sublimit are included within and are not additional to the total amount of the loss. So the bankruptcy stipulation said nothing about the effect of having incurred the $500,000. I'm sorry, Your Honor. I thought you were speaking to the stipulation that was entered for the court. I should have clarified it. I didn't say. I understood their argument to be about who owned that claim or that amount or that incurment. So now in the bankruptcy stipulation, now that I understand your question, all it said was is that my client, Waddles, was entitled to prosecute its claims against Exide and recover against the available insurance and the carriers had all available defenses, period. And you get, let's say you get the $500,000. You're representing the landlord. The landlord didn't incur the money. Exide incurred the money. Who's ultimately going to get the $500,000? And if Exide's in bankruptcy, who gets that? That's between Exide and their carrier. It's not relevant to the calculation of the deductible by the express terms of the policy. But I'm saying you're lateraling it over back to Exide. Then the landlord's sending that $500,000 back to the person who incurred. It'd be a windfall for you to get the $500,000, wouldn't it? No, because we're entitled to recover the full amount of the $2.3 million judgment plus interest at 12 percent, which is entitled under the release and also entitled. But you didn't incur it. You didn't spend $500,000, the landlord. Well, we spent a lot more than that, Your Honor, trying this case. And this has been a very long road, as you can imagine. The point is, and I would ask, Your Honor, to read the language carefully. I know it's somewhat confusing, but the deductible is inclusive of the defense costs. What provision? The deductible is what? AF, Your Honor. All right. Okay. What that says is, and it could be read the way you want to read it, but it says that the maximum amount of expense incurred by the underwriters in respect of such defense, which amount shall be included within and not additional to the total amount of the loss? Correct. Okay. Then it says to which the policy's limits and deductibles shall be applied. It does not say that the defense costs shall count against the deductibles. Well, with all due respect, Your Honor, it says that the defense costs shall be included within and not additional to the total amount of the loss. Period. To which the policy's limits and deductibles shall be . . . To which the limits and the deductible apply. To which the policy's limits and deductibles shall be applied. Correct. It is a very unclear provision. True. Actually, although the district court construed this policy against the insurance company, your client presented the manuscript copy which included this particular phrase, I think there's a good argument it ought to be construed against you. Nobody raised that, and I'm not going to hold it, so you don't need to worry about that, but I just . . . That would be a complete reversal of insurance law where the policy is construed against the drafter, Your Honor. But I won't . . . it wasn't raised, so I don't need to get into it with you. Are there other . . . I think you ought to address the 836 and the 360 and the tenant's clause. Is that all right with you? Yes. Yes. All right. The tenant clause, Your Honor? Yeah. All right. That clause is a grant of coverage under 8J1 and a limitation of coverage under 8J2. 8J2 is the problematic language. And as a limitation under the St. Paul Mercury insurance case which we cite, it requires a narrow construction, and the insurer, ACE, has the duty to define limitations on coverage in a clear and explicit way with clear and explicit terms. And it must be construed against ACE unless the limitation is clear and unequivocal. And we would also point out that in determining whether there's an ambiguity, the policy must be read as a layman, not as an insurance expert or an attorney. There's an exception to that rule in the Georgia law with respect to technical terms. It seems to me the Napoleonic Code is a technical term. Well, I cite the Mason case for that, Your Honor, and counsel would turn this into a geographical limitation by country. And there is a coverage territory set forth in the policy. It's at docket 54-9 at page 14, and it's worldwide, and then it excludes specific named countries, Afghanistan, Cuba, Iran, Iraq, Libya, North Korea, and countries subject to U.S. trade sanctions. This shows that this insurer knows how to specify coverage for countries for which coverage applies. They didn't do so with 8J, and they hardly did so clearly. So we ought to construe this as meaning in the United States and in Georgia in particular there's a Napoleonic or other such code that applies? It says Napoleonic or other civil or commercial code. Right. And a layman would understand by reading the territorial coverage in the declarations page that he has coverage worldwide except for specified named countries. And with respect to the tenant liability, he would understand that he has coverage for tenant liability for perils defined by a civil or commercial code, for perils defined by a civil or commercial code. That's the language. And that is what happened here because our lease at paragraph 6, docket 52-3 What's the civil code in Georgia? It's actually in Washington, Your Honor, because that's Great. What's the civil code? There's two. There's Washington Administrative Code 51-50-003. That's the International Building Code. And there's OSHA, which is Washington Administrative Code 296-800-110. But they didn't sue under the building code violation. There was a finding that Exide breached the lease. The lease at paragraph 6.2 states that Exide is required to comply with all applicable statutes, ordinances, rules, and regulations regarding use of the premises. That is a term of the breach. That's a term of the lease. They breached it. And the facts where I started off are that sulfuric acid became airborne because they didn't contain it at the charging station. It condensed onto the top of wood beams and charred them. This was your point, Your Honor. It charred the beams. It broke down the cellulose in the wood. And this is in the record. We have the WJE engineering report. You can see the top of the trusses charred, and they lose their structural integrity. They had to be replaced under Washington's version of the IBC, which is the Washington Administrative Code beside it. That is a breach of a code. It's liability arising from a sulfuric acid condensed on other components in this warehouse caused sulfuric acid dust that rained down on the warehouse continually. So your codes, though, back to what your codes are, your codes are an OSHA code and some other code, 51-50 something. And those codes preclude what? The provision of the policy that we're referring to, the limitation, 8J2. Right, but you're saying you've got to find somewhere a civil code. Where is your civil code that you're deriving your authority for for this provision? And you say it's OSHA. How does OSHA, the particular regulation, speak to what we're talking about here? They're cited in the EMB Industrial Hygienist Report, which is docket 52. I'm not talking about dockets. What does OSHA say that has anything to do with sulfuric acid corroding things? As a result of the sulfuric acid dust, OSHA held and the industrial hygienist found that it was an unsafe workplace. It was not able to be occupied for the use intended as a warehouse. That's property damage. It's apparel defined by a code and it's a breach of the lease. Likewise, these wood trusses, they were charred. They weren't corroded. Corrosion is the deterioration of metal. That's the Parks case that they cite. Charring of these wood trusses is a chemical reaction akin to a burn. It's a breakdown of the cellulose. It's not corrosion. And because of that, we had to remove all these beams from this building because it no longer met the code, the building code. Because even if all of this that you've been talking about is true, if the terms civil or commercial code are to be read like their companions, pursuant to that canon, they'd have to be read like the Napoleonic code so that, in other words, if we read this HA clause to mean that the law referred to, the civil or commercial code referred to, has to be in the nature of the Napoleonic code, then you lose. Is that not correct? Well, that's, with all due respect, my opponent's argument. But it says Napoleonic or other civil or commercial . . . conjunction with Napoleonic code. So it is of a similar nature. If that is the case, it violates another contract interpretation canon, which is the words other civil or commercial codes are now superfluous because they're all Napoleonic codes. And they drafted it. It has to be clear, unambiguous, unequivocal. It's not . . . the fact that our district court below, Judge Cohen, found that there were other plausible interpretations as a matter of law . . . He did. Well, he did do that. But he jumped straight to the ambiguity clause and resolving that against the insurance company, which, number one, I think is suspect because your client drafted that provision as well as the defense provision. Is that not true? No, Your Honor. The manuscript that your client Waddles through Marsh presented to Ace, did it not include this 8J? My client Waddles had nothing to do with drafting the policy, Your Honor. Well, did your not . . . Marsh presented a manuscript to Starr, who was agent for Ace. And that manuscript, I believe, included both 8D and 8J, the ones that issue here. Well, Your Honor, I have to go back to your comment. That is not an issue that's been raised on appeal. I'd like to know whether or not that's true. As I sit here, as I stand here today, I do not know, Your Honor. And I don't think it's relevant. It's not raised on appeal. It's not a basis for a decision as to whether Exide's agent, Marsh, somehow is responsible as the drafter for this. I don't think I can tell you with authority whether they did or not, as I stand here today, without going through the record. All right. All right. But if it is . . . let me ask you one more canon that I think the district court should have addressed, and that is the canon that says this whole provision in effect would be nullified because almost any country in which this company, Exide, operated would have some kind of civil code, like a building code. And if that is so, then to add this language, this exclusion applies only to liability incurred in those countries in which a Napoleonic or other civil code applies. That would have no meaning at all because all the countries would have some kind of building code. So there's two answers. One is under the tenant liability, it's liability under a peril defined by a code. That's clear. To your second question or comment, which is, is there any other country that wouldn't qualify? And I'm not an expert on religious law or Islamic law or Sharia law, but those types of countries don't have civil or commercial codes. They have religious codes, and the insurance company says we're not going to do that. We want it to be a reliable, civil, commercial code like Louisiana, Your Honor, which is in the United States, and like Washington that has a civil or commercial code. And we have that situation here. And remember, the carrier had the opportunity to designate those countries that it didn't want to have coverage in, and they list it in the declarations page. And now we want to read another territorial coverage provision with respect to countries into this 8J2 limitation, which really is a limitation that says there will be coverage for tenant liability for perils arising out of a civil or commercial code. Napoleonic code is one of them, but so is OSHA, so is the building code. Okay. Mr. Hanferman, thank you. We'll hear from Mr. Garcia now. You did not argue that Waddles, in effect, was the drafter of this 8J? That's right, Your Honor. And in fact, Waddles is a third party to this contract that ensured was Exide. You are correct that the form was prepared by Exide's broker, which is Marsh. Yes, so I mistook when I said it was Waddles, but it was Exide. And of course, Waddles is standing in the shoes of Exide. That's correct, Your Honor. I think that is an argument that we could have made, but I don't think we have the capacity as them to win on this issue. And I do think it appears the Court understands our argument on liability extension. I just want to make a few points. First is that they did not dispute Judge Anderson's math, which is our math, which means this liability extension issue resolves the case. And second, this is a geographical limitation. They're correct. This is a worldwide coverage for property, and the liability coverage applies in a subset of countries. But they're saying that you, at some point in the policy, exclude places like North Korea. And then in this particular provision, it's a new sort of geographical limitation. That's correct. They argue it would make sense if you're excluding Muslim countries or places that don't have those kinds of laws. But in a common sense way, OSHA seems like a civil code, maybe not a Napoleonic code, but a civil code. Right. And that's why the key is to read it all together. And so one canon is read the words with its neighbors. And the key one is, again, Judge Anderson, the rule against superfluity. Their reading of this policy— But his argument against that is that there are a lot of countries, Islamic countries, in which this would not apply. So, Your Honor, I am not an expert on Islamic countries, and I actually don't know if that's true. It was not briefed, and I'm not prepared to address that. Certainly, there is a well-known distinction between common-law countries and civil-law countries. And I would just direct the Court to Mr. Saunders' deposition, which is docket entry 53-1 at page 29. He testifies this provision is meant to apply in countries without the common law. So there is— Well, you know, the average person gets an insurance policy, and I think, good, I'm not in North Korea. We've got this provision here, but, geez, civil law, Napoleonic law, the only countries, then, that would be subject to this would be, you say, France and, what, some other European countries. The United States is out. You're not covered if you're in the United States. About half of the developed world, Your Honor, is civil-law countries. And, again, any reasonable insurer would know that this is primarily a property policy. When you get towards the end of the policy, there's this limited extension for liability coverage, and it applies in countries where a Napoleonic or other civil law insurance policy— But maybe the average insurer looks at it and says, civil code, yeah, we're out the wazoo. We've got civil codes in the United States of America. That is a — the two reasons that is not a reasonable reading, Your Honor, are, first, the technical term canon, which Napoleonic certainly is a technical term that you would require knowledge about, and, second, again, reading it to be every country in the world. Again, I'm not prepared to address Islamic countries. But you're asking us as a matter of law, sort of. I guess you have an expert. As a matter of law, the United States is not a country that would fit within this definition, Napoleonic country or country with civil whatever the phrase was. That's correct, Your Honor. As a matter of law, for all insurance policies out there, that's what we'd be holding with this case. For any provision that's worded in this way, Your Honor, that's correct. And, again, even if the policy, when you first read it, is not the clearest, they — the insurer's reading still needs to be a reasonable one. And their reading of this is that it applies in essentially any country with any code, even if the liability is not incurred due to that code. So for those reasons, we would submit that this plainly does not apply on these facts. Thank you, Counsel. We'll take that case under addition and stand in recess until tomorrow morning.